DANIEL O. BLAU (Cal. Bar No. 305008)
Email:  blaud@sec.gov
TAMAR M. BRAZ (Cal. Bar No. 264080)
Email:  brazt@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Gary Y. Leung, Associate Director
Douglas M. Miller, Supervisory Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 8:25-cv-02324 |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| LINH THUY LE and TRONG HOANG LUU, | |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

### JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.     Defendants have, directly or indirectly, made use of the means or

instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.    Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because Defendants Linh Thuy Le and Trong Hoang Luu both reside in this district.

## SUMMARY

4.    This civil enforcement action concerns an offering fraud perpetrated primarily against members of the Vietnamese and Latino communities in multiple states by defendants Linh Thuy Le ("Le") and her husband, Trong Hoang Luu ("Luu"), through their companies Inventis Ventures, LLC ("Ventures") and Inventis Ventures Holding, Inc. ("Holdings") (collectively "Inventis"). Between March 22, 2022, and November 2023, Le raised at least $26.5 million with Inventis from at least 1,400 people in an unregistered securities offering. The true amount raised by defendants and the number of defrauded investors may be even higher due to many investments and payments having been transacted in cash.

5.    Le and Inventis lured investors with false promises of guaranteed returns of either 15% per month or at least 360% per year, together with a return of principal after one year, if they invested a minimum of $5,000. Le also falsely told investors that Inventis would use their funds to invest in different "emerging projects" in its "investment portfolio," giving different investors inconsistent descriptions of the use of funds and source of returns, varying from "real estate" and "health insurance investments" to claims that she had access to an unnamed bank that provided 40% returns. She falsely told many investors that the investments were "guaranteed," "safe," or "insured."

6.      Le's statements to investors were materially false and misleading because, rather than use investor money to engage in legitimate business activity, Le and Luu misappropriated the funds, spending investor monies for their personal benefit, paying referral fees, and making Ponzi-like distribution payments to earlier investors in an attempt to keep their scheme going.

7.      Luu, who knew Le was making these false statements to investors, facilitated and advanced the scheme by, among other things, signing more than 95% of the checks issued by Inventis, including more than 96% of the checks used to make approximately $16.5 million in Ponzi-like distribution payments to investors and to make approximately $1.5 million in referral fee payments to individuals who found new investors.

8.      Like all Ponzi-like schemes, Inventis eventually collapsed and many of the investors abruptly stopped receiving the interest payments they had been promised and were never repaid their principal investment. Even then, Le continued to make false and misleading statements to investors claiming that Inventis had to stop making payments only because of "bank audits" and "banking compliance issues."

## THE DEFENDANTS

9.      Le, age 58, is a resident of Yorba Linda, California. Le runs both Ventures and Holdings. Le is the CEO, CFO, Secretary, and Director of Ventures and the Manager of Holdings. Le is a signatory to the bank accounts for Inventis and she signed checks issued from three Holdings accounts. Le is licensed in the state of California to sell life insurance.

10.     Luu, age 59, is married to Le and they reside together in Yorba Linda, California. Luu is a signatory to most of the bank accounts for Inventis. Luu was previously employed by WMA Securities, Inc, from 1998 to 2002, and held Series 6, 26, and 63 licenses, which have all expired. Luu was suspended by the National Association of Securities Dealers, Inc., in 2002 for failure to respond to requests for

documents and/or information and for failure to take corrective action, and he was ultimately barred from association with any NASD member.

## RELATED ENTITIES

11.     Ventures is a Utah limited liability company, with its principal place of business in Tustin, CA. Ventures was formed in 2011 by a third party and was transferred to Le and Luu in 2016. Le and Luu are listed as Ventures's managers on corporate documents. Ventures is owned and controlled by Le and Luu. Le and Luu have signing authority over most of its bank accounts. Together with Holdings, Ventures purports to engage in the business of "strategic assisted investment planning with progressive repeatable return on investment." Ventures has never been registered with the SEC in any capacity and has not registered any offering of its securities. Ventures' registration with the Utah Secretary of State has lapsed, its bank accounts are at zero balance, and its office is closed.

12.     Holdings is a California corporation formed in 2022 by Le, with its principal place of business in Tustin, California. Holdings is owned and controlled by Le and Luu. Le and Luu have signing authority over its bank accounts. Together with Ventures, Holdings purports to engage in the business of "strategic assisted investment planning with progressive repeatable return on investment." Holdings has never been registered with the SEC in any capacity and it has not registered any offering of its securities. Holdings' registration with the California Secretary of State has lapsed, its bank accounts are at zero balance, and its office is closed.

13.     Wow Win on Wealth ("Wow") is a California corporation formed in 2022 by Le, with its principal place of business in Tustin, California. According to corporate records, Le is the CEO and Director, and Luu is the CFO, Secretary, and agent for service of process. Le and Luu are also signatories to its bank accounts. Wow purported to offer loans that would generate upfront cash and be invested so that it could provide monthly payments.

## THE ALLEGATIONS

**A.    Inventis and Le's Solicitation of Investors**

14.    From at least March 2022 to November 2023, Le and Inventis, through its employees and at Le's direction, solicited investors in a variety of ways for their fraudulent securities offering.

15.    Prior to Inventis, Le and Luu ran a variety of businesses out of their Tustin office, including insurance sales and sales of membership interests in Wow.

16.    As part of Wow, Le told prospective clients that a portion of the loan proceeds obtained through Wow would be invested to generate returns to cover the loan payments and provide income.

17.    Inventis was the vehicle in which a portion of the Wow loan proceeds would be invested and which would, in turn, make investments to generate returns.

18.    By around March 2022, Le decided to allow investors to invest directly in Inventis without joining the Wow program, and Le and Luu began promoting Inventis. By around June 2022, when the Wow loans failed to fund, Le substantially pivoted to promoting Inventis instead of Wow.

19.    Inventis was promoted on the website for Wow, and investors in Wow were referred by Le and Wow employees to Inventis.

20.    In some cases, Le personally met with potential investors in Inventis. In some instances, those meetings took place at Le's home.

21.    Luu was present during at least some of Le's investor meetings.

22.    According to investors and employees present at those meetings, Luu nodded approvingly when Le made representations about the use of funds and source of returns, and did not make any corrections to those representations

23.    By around December 2022, as the fraudulent securities offering expanded, Le also recruited individuals in the Southern California Latino community to work for Inventis and to make pitches to additional investors.

24.    Le promised employees and certain investors referral fees if they

brought new investments into Inventis.

25.    The referral fee structure varied and was set at Le's discretion, but the most common payments were: (1) for employees who referred investors, a 5% monthly fee on the amount invested for a period of one year and (2) for investors who referred other investors, a 3% monthly fee on the amount invested.

26.    Some investor presentations were conducted by Inventis employees. According to Inventis employees, Le trained employees on what to say to prospective investors.

27.    Inventis employees and investors brought prospective investors to the Inventis office for presentations, which were conducted in Spanish, English, and Vietnamese.

28.    Prospective investors would arrive at the company office where, in some cases, they were greeted with the sight of current investors lining up to collect envelopes representing their monthly earnings.

29.    Inventis employees, in accordance with Le's directions, encouraged prospective investors to invest that day and to pay in cash, leading many investors to sign contracts after the presentations.

30.    Although later investors primarily spoke to Inventis employees, Le continued to meet directly with high dollar investors and investors that "looked professional" to pitch the Inventis investment.

31.    Individual investments generally ranged from $5,000 to $300,000. Many investors were later solicited to make additional investments or to rollover their purported earnings from prior investments into new investments.

32.    Inventis, Le, and the employees she trained failed to take any steps to verify the accredited status of the investors they solicited and, as a result, many unaccredited investors invested in Inventis.

33.    Investments in Inventis were memorialized in investment agreements signed by either Le or by an Inventis employee that Le specifically authorized to sign

on her behalf.

34.    The Inventis investor agreements generally stated that "in Consideration of the Lender loaning certain monies to the Company, as a form of JVA (Joint Venture Arrangement) this agreement is extended with the explicit purpose of the Company investing in different emerging projects in its investment portfolio." They further set forth the amount of the funds to be loaned by the Inventis investor, as well as an agreed rate of investment return over a fixed term, with the principal amount loaned to be repaid in full at the defined term's end.

**B.    Le and Luu's Roles at Inventis**

35.    Le is the CEO, CFO, Secretary, and Director of Ventures, and the manager of Holdings and played a key role in the Inventis offering.

36.    As set forth herein, Le made representations directly to investors and told employees what representations to make to investors regarding the terms of the Inventis investment and the source of its returns.

37.    Le signed multiple investor agreements on the company's behalf.

38.    As the "head boss" of Inventis, Le controlled the hiring, firing, and compensation of employees and managed the day-to-day functions of the office.

39.    Le was a signatory to the companies' bank accounts, signed checks issued from three Holdings accounts, handled investor funds, and deposited investor funds in the bank.

40.    Luu also played an important role at Inventis. Luu had control over Inventis's bank accounts. He signed nearly all of the checks issued by Inventis to investors. He sat in the largest office, and he attended at least some investor meetings and employee trainings where Le described the offering, where he nodded along approvingly and without offering any corrections. Luu monitored cameras, with audio, that were installed all over the company office.

**C.    The Inventis Securities Offering Was Fraudulent**

41.    When raising at least $26.5 million with Inventis from at least 1,400

investors from March 2022 to November 2023, Le made materially false and misleading statements to investors about the use of their funds, the source of their investment returns, the return of their capital, and the safety of their investments; and Le and Luu engaged in a scheme to defraud by disseminating deceptive statements, misappropriating investor funds, making Ponzi-like payments, and lulling investors into believing their investments remained secure, even after their scheme had begun to collapse.

**1.    Le's Materially False and Misleading Statements**

      **a.    Le's representations about the terms of the investment in Inventis**

42.    Le made promises to investors and trained employees to make promises to investors about the terms of their investment in Inventis.

43.    Le and the employees she trained made these promises during in-person conversations and during presentations held on multiple occasions between November 2021 and November 2023, typically at Inventis's offices in Tustin, California.

44.    The promise at the core of the Inventis scheme, which Le and her employees pitched to investors, was that, for a minimum investment of $5,000 in Inventis, investors would receive returns of either 15% paid monthly or at least 360% paid after one year, together with a return of principal after one year.

45.    The investment agreements between investors and Ventures echoed these promises, referring to investors as "lenders" and stating that the company "agrees to repay the Lender" in one of two ways as selected by the investor: a 15% rate in "monthly return consideration" or, depending on the agreement, either "a single premium to the Lender a 360% combined return as a Balloon payment at the end of the term of 12 months" or "a 15% rate compounded monthly in a 1 year term . . . [a]t the end of 12 months," which is effectively a 435% annual rate of return.

46.    The investment agreements also stated that the agreement could be

renewed at the end of the term.

47.    One investor asked why the investment was described in the agreements as a loan, and Le told him that it was "illegal to pay 15% returns."

48.    Le and her employees also promised investors the returns were "guaranteed," "safe," or "insured."

### b.    Le's representations about the use of investors' funds

49.    When investors asked about the specific use of the funds raised by Inventis, Le and her employees, at Le's direction, gave investors a variety of explanations.

50.    One investor was told that it would be used for "building and construction," another was told that funds were used for "commercial real estate," another was told that there was a "private company that would fund Le," another was told "startups," another was told "investments in other countries," and yet another was told that the funds would be put into "health insurance investments with the government."

51.    Le also led several investors and employees to believe that she had a relationship with an unnamed bank that was providing her with sufficient returns to make the payments.

52.    For example, Le told one investor that if Le "gave a bank $100,000 that could be leveraged for $1 million," another investor that a friend "gave Le a bank" that did investments in other countries, an employee that Inventis invested in a "Native American Bank," and multiple investors that she had access to a bank that provided 40% returns, of which 20% went to Le, 5% went to referral fees, and 15% went to investors.

53.    The Wow website described Inventis as a business engaged in "strategic assisted investment planning with progressive repeatable return on investment."

54.    The "Inventis Ventures LLC Contract Agreement" provided to investors and signed on behalf of Inventis by Le, or employees that Le authorized to sign on

her behalf, stated that "in Consideration of the Lender loaning certain monies to the Company, as a form of JVA (Joint Venture Arrangement) this agreement is extended with the explicit purpose of the Company investing in different emerging projects in its investment portfolio."

55.    At other times, Le directed her employees to tell people that the specific use of funds by Inventis did not matter because the funds were "guaranteed" and "safe."

56.    Based on these and other representations, investors understood that Inventis would use investor money to generate returns for them.

57.    These representations about the source of returns were made on multiple occasions between November 2021 and November 2023, typically at Inventis's offices in Tustin, California.

58.    For example, in or around April 2022, Le and an employee told Investor A that if Investor A invested in Inventis, Investor A would receive 15% monthly returns and a return of principal at the end of one year.

59.    Le and the employee told Investor A that Inventis had access to a bank with a "trading license" with the government that provided 40% returns, of which 15% would go to the investor, 5% would be paid as a referral fee, and 20% would go to Inventis.

60.    Le and the employee also told Investor A that the returns were guaranteed.

61.    In another example, in or around November 2021, Investor B met with Le in the Tustin office.  During the meeting, Le told Investor B that if Investor B invested a minimum of $5,000 in Inventis, Investor B would receive 15% monthly returns and a return of principal at the end of the year.

62.    Le also promised Investor B that the principal was guaranteed because it was insured.

63.    Le told Investor B that Inventis was able to generate returns because it

had investments in different projects, including commercial real estate, construction financing, and insurance. She also told Investor B that she had access to a bank that would pay 40% returns, which enabled her to pay the 15% returns.

64.    Similarly, on or around November 27, 2023, Investor C met with Le in the Tustin office. During the meeting, Le told Investor C that if Investor C invested in Inventis, Investor C would receive 15% monthly returns and a return of principal at the end of the year.

65.    Le told Investor C that Inventis would use their funds in health insurance investments with the government. She also told Investor C that she received 25% returns from these investments, which enabled her to pay the 15% returns. She told Investor C, "Trust me", "all will be okay," and "this is not a scam."

> c.    **Le's representations about the terms of their investment and the source of their investment returns were false and misleading**

66.    The representations that Le made, and trained employees to make, to investors regarding the terms of their investments in Inventis and the sources of the returns on their investments were false and misleading.

67.    Le's representations about the source of investors' returns were false and misleading because investor funds were in fact used to pay returns to other investors, referral fees, and for Le and Luu's personal benefit.

68.    Le's representations about the terms of an investment in Inventis – high monthly or annual investment gains in combination with a return of their invested principal – were false and misleading because investors did not receive either their promised returns or return of capital after the scheme collapsed.

69.    Le's representations that investor funds were guaranteed and safe were false and misleading because in light of the foregoing, an investment in Inventis was neither guaranteed nor safe.

> d.    **Le's false and misleading representations were material**

70.    Le's and Inventis employees' representations about the sources of

returns were material. That is, they were important to investors in deciding whether to invest in Inventis.

71.    Le's and Inventis employees' representations about the terms of the investment in Inventis were material. That is, they were important to investors in deciding whether to invest in Inventis.

72.    Le's and Inventis employees' representations about the safety of the investment in Inventis were material. That is, they were important to investors in deciding whether to invest in Inventis.

**2.    Le and Luu Engaged in a Scheme to Defraud**

73.    Le and Luu engaged in a course of conduct to deceive Inventis investors.

74.    As alleged above, Le made and disseminated false and misleading statements to investors about the use of their funds, the source of their promised investment returns, and the safety of their investments.

75.    Apart from Le's false and misleading statements to investors, Le and Luu engaged in further deceptive acts in furtherance of their scheme.  Contrary to Le's representations to investors, Inventis used the money that it raised from investors to make distributions to earlier investors, to pay referral fees for recruiting investors, and for Le and Luu's personal benefit.

76.    Rather than running a legitimate business focused on investing in "different emerging projects," Inventis was a Ponzi-like scheme.

77.    Inventis raised at least $26.5 million from at least 1,400 investors from at least 12 states.

78.    Inventis distributed approximately $16.5 million to investors in purported returns on their investments, and approximately $1.5 million to Inventis employees and others as referral fees, resulting in at least $8.5 million net investor funds received.

79.    Luu signed more than 95% of the checks issued from Inventis's bank accounts, including 96% of the checks used to make Ponzi-like interest payments to

investors and to pay referral fees for finding investors, together totaling over $18 million.

80.    Rather than running a legitimate business focused on investing in "different emerging projects," Le and Luu misappropriated investor funds.

81.    For example, with respect to investor funds being used for Le and Luu's personal benefit, bank records show that Luu transferred approximately $4.7 million to entities controlled by Le and Luu, approximately $1 million net to their personal accounts, and more than $880,000 net to purchase real estate and pay mortgages.

82.    Employees also reported that, during the period when the Inventis scheme was underway, Le catered monthly parties at restaurants and described travel to Dubai with Luu where she posted photos of limousines, luxury meals, and paintings that she had purchased, which she claimed were worth more than $20,000. Le spent $12,000 on "tour fares" in October 2023.

83.    These amounts do not include all of the funds Inventis received from investors in the form of cash or all of the cash payments for distributions, referral fees, and to Le and Luu personally.

**D.    The Inventis Scheme Collapses**

84.    The Inventis scheme collapsed in or about September 2023, when the checks issued to investors started bouncing, and Inventis eventually stopped making payments altogether.

85.    As Inventis collapsed, Le and Luu misappropriated substantial amounts of money from Inventis' bank accounts for their personal use rather than use those funds to pay investors or make investments for the benefit of investors.

86.    On October 20, 2023, a wire transfer was made that moved $679,913.28 from an Inventis account to an account Le and Luu controlled in the name of TBD Miracles Production ("TBD"). On November 16, 2023, another $350,000 moved from Inventis to TBD. Over the course of December 2023 and January 2024, over $1,000,000 of these funds were moved to other accounts controlled by Le and Luu,

including to Wow Construction ($500,000) and the Luu Le Family Trust (approximately $300,000).

87.    During this time, even though Inventis was no longer making regular distributions, Le and Luu directed employees to continue to sign investors up to new contracts.

88.    For example, Le met with an investor in her home on or about November 1, 2023, where she promised the investor monthly returns and encouraged him to invest $200,000.

89.    According to bank records, Inventis received over 130 additional investments from September 2023 to November 2023, raising almost $4.4 million.

90.    Le and Inventis employees, at Le's direction, made false and misleading statements to investors and engaged in other deceptive acts to lull investors into thinking they would recoup their funds.

91.    For example, Le and Inventis employees, at Le's direction, told investors that "bank audits" and "banking compliance issues" caused Inventis to cease payments and restructure, and that with additional time Inventis would resume the program and pay people back.

92.    Inventis then pivoted to directing investors to other schemes so that they could recover the funds previously invested in Inventis.

93.    First, beginning in or around November 2023, Le directed investors to open and fund an account at Apex Bank, a purported "sovereign bank," to recover their funds. The Georgia Department of Banking and Finance had already issued an order in September 2023 mandating that Apex Bank cease and desist conducting business as a bank because it had never been registered as a bank.

94.    Next, when a group of investors met Le and Luu at their home, both Le and Luu told those investors that, in order for them to receive the funds they were promised under the Inventis scheme, those investors had to open and fund accounts with Trage Technologies, Ltd. ("Trage"), a digital asset scheme. Luu told an investor

that the investor would only receive the promised Inventis payments to the Trage account if the investor did not withdraw funds from that account. Trage was later charged with being an unregistered offering and fraud by the California Department of Financial Protection and Innovation in violation of California Corporations Code Sections 25110 and 25401, and by the Texas State Securities Board for violations of Texas Securities Act Sections 4003.001 and 4004.051.

95.    At another point, Inventis advertised a different digital asset scheme involving "USDT," a stable coin, that would purportedly provide 36% returns.

96.    Le also told employees that she was immune from prosecution, and threatened that if investors pursued legal action or complained to law enforcement they would not receive their money back.

**E.    The Inventis Securities Offering was Unregistered**

**1.    Because the Inventis agreements are investment contracts, they are securities**

97.    Investors invested money in Inventis.

98.    Investors' investments were in a common enterprise. Specifically, investor funds were pooled in Inventis accounts and returns were awarded in proportion to investment amount. Moreover, the investment was promoted as one in which the investors' fortunes were tied to the promoters' fortunes: Le told at least some investors that she had access to a bank that generated 40% returns, which, in turn allowed her to keep 20%, pay investors 15%, and pay referral fees of 5%.

99.    Investors were dependent on Inventis to deploy investor monies in a manner that would be mutually beneficial. Le and Inventis were to perform all of the services necessary for the generation of returns for entirely passive investors.

100.    Because the Inventis agreements are investment contracts, they are securities.

**2.    Because the Inventis agreements are notes, they are securities**

101.    The investment agreements at issue are written promises by one party to

pay principal and interest to another party and, therefore, fall within the ordinary meaning of notes.

102.   The investors were primarily motivated by the generation of profits, and Le and employees at her direction represented that investor funds would be used for business enterprises. Investors and employees expected to receive monthly interest payments of 15% or 20% or, alternatively, at least 360% in interest paid after a year, high rates of return that far exceed the rates available on loans or traditional investments. Le told investors that she would use their funds to invest in various business ventures that would ostensibly generate sufficient returns to pay the promised rates of return.

103.   Le, through Inventis, marketed, offered and sold the contracts to hundreds of investors across at least 12 states, with no restrictions on assignment or transfer of the notes. Investors were also provided form documents and had no opportunity to negotiate terms.

104.   A reasonable member of the investing public would consider the notes to be an investment, given that the agreements were marketed as high return opportunities, investors stated that they viewed the funds as investments, and the contracts stated that the loans were for the "explicit purpose of the Company investing in different emerging projects."

105.   The agreements were not collateralized or insured and there is no other risk-reducing factor, such as another regulatory scheme, that would render the application of the securities laws unnecessary.

### 3.   The Inventis securities offering was unregistered

106.   The offering of Inventis securities was not registered with the SEC and did not qualify for any exemption from registration.

107.   Le and Inventis offered and sold the securities through interstate commerce to investors in multiple states.

108.   Le and Inventis offered and sold securities through general solicitation

by promoting Inventis on the Wow website and through referrals from investors and employees to anyone in the community, ultimately reaching over 1,400 investors across multiple states, all or some of whom had no pre-existing substantive relationship with Le or Luu.

109.    The Inventis securities offering far exceeded $10 million.

110.    Inventis did not provide, and investors had no access to, audited financial statements or other information that registration would have required.

## F.    Le and Luu Acted with Scienter and Negligently

111.    Le and Luu acted with scienter in carrying out the scheme to defraud and, for Le, in making the false and misleading statements to investors.  Le and Luu also acted negligently in carrying out this scheme and, for Le, in making the false and misleading statements.  That is, Le and Luu failed to exercise the level of care that a reasonable person would have exercised under the same circumstances.

112.    Le and Luu's scienter and failure to act reasonably under the circumstances is demonstrated, in part, by the following:

(a)    Le acted with scienter, or at a minimum, was deliberately and consciously reckless. She made false and misleading statements to investors regarding the terms of the investment, the use of funds by Inventis, the source of returns, and the safety of investment. She signed agreements with investors making false and misleading statements regarding the terms of the investment, the use of funds by Inventis, and the source of returns. She instructed Inventis employees to make false and misleading statements regarding the terms of the investment, the use of funds by Inventis, the source of returns, and the safety of investment. She continued to make these false and misleading statements after Inventis was no longer able to make payments to investors. She personally benefitted by receiving investor funds to her and Luu's bank accounts and using investor monies to fund the purchase of properties.

(b)    Luu acted with scienter, or at a minimum, was deliberately and

consciously reckless. He was present while Le made false statements to investors, and he monitored camera feeds showing interactions between employees and investors. He controlled Inventis's bank accounts, he received and handled investor funds, directed misuse of new investor funds to pay previous investors, and personally benefitted by transferring investor funds to his and Le's bank accounts and using investor monies to fund the purchase of properties.

**G.    Le and Luu Obtained Money and Property as a Result of the Scheme**

113.    Le and Luu obtained money and property as a result of the Inventis schemes.

114.    Le and Luu transferred approximately $4.7 million, net, of Inventis funds to entities controlled by them.

115.    Le and Luu transferred approximately $1 million, net, of Inventis funds to their personal accounts.

116.    Le and Luu used more than $880,000, net, of Inventis funds to purchase real estate and pay for mortgages.

117.    These amounts do not include all of the funds Inventis received from investors in the form of cash or all of the cash payments for distributions, referral fees, and to Le and Luu personally.

<u>**FIRST CLAIM FOR RELIEF**</u>

**Fraud in Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(against Defendant Le)**

118.    The SEC realleges and incorporates by reference paragraphs 1 through 117 above.

119.    In connection with the purchase or sale of securities, Le made material misstatements, false statements, and omissions to investors. Le made numerous false and misleading statements both in the investment agreements at issue and the oral statements she made or directed during the securities offering, including: Statements

in the agreements that Inventis would use the funds to "invest in different emerging projects in its investment portfolio" and verbal statements describing the use of funds for various investments, when in fact the funds were used to pay investor returns, referral fees, and for her personal benefit; written and oral promises that Inventis would pay monthly returns of 15% or annual returns of at least 360% and a return of capital at the end of one year when, in reality, after the scheme collapsed, investors did not receive either their returns or the return of capital; and verbal statements that investor funds were guaranteed and safe when, in reality the funds were neither guaranteed nor safe.

120.    In connection with the purchase or sale of securities, Le engaged in a course of conduct to deceive investors. Le made and disseminated false and misleading statements about the use of funds, the source of the returns, and the safety of the investments. Le was a signatory to the bank accounts, made payments out of three accounts, handled investor funds and took money to the bank together with Luu, and played a role in the Ponzi-like payments, passing the payments off as returns on investment when, in fact, they were payments of other investor's capital. Le furthered the scheme by lulling investors into feeling their investments were secure after the initial investments were made and after the scheme collapsed, reassuring investors that she would pay their promised returns and referring them to various schemes that would allegedly allow them to recoup the funds they had invested in Inventis.

121.    By engaging in the conduct described above, Defendant Le, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other

persons. In doing so, Defendant Le acted with scienter.

122.    By engaging in the conduct described above, Defendant Le violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b) & 240.10b-5(c).

## SECOND CLAIM FOR RELIEF

### Fraud in Connection with the Purchase or Sale of Securities

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)

### (against Defendant Luu)

123.    The SEC realleges and incorporates by reference paragraphs 1 through 122 above.

124.    In connection with the purchase or sale of securities, Luu engaged in a scheme to defraud investors by controlling the bank accounts of Inventis and signing more than 95% of the checks issued by Inventis, including thousands of checks for the Ponzi-like distribution payments which had the effect of falsely confirming Le's assertions that Inventis was a successful business, and by engaging in lulling activities together with Le, including personally and falsely claiming that investors would receive their payments due under the Inventis scheme by funding Trage accounts.

125.    By engaging in the conduct described above, Defendant Luu, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:  (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons. In doing so, Defendant Luu acted with scienter.

126.    By engaging in the conduct described above, Defendant Luu violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the

Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

### THIRD CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities**

**Violations of Section 17(a) of the Securities Act**

**(against Defendant Le)**

127.    The SEC realleges and incorporates by reference paragraphs 1 through 126 above.

128.    In connection with the offer or sale of securities, Le made material misstatements, false statements, and omissions to investors. Le made numerous false and misleading statements both in the investment agreements at issue and the oral statements she made or directed during the securities offering, including: Statements in the agreements that Inventis would use the funds to "invest in different emerging projects in its investment portfolio" and verbal statements describing the use of funds for various investments, when in fact the funds were used to pay investor returns, referral fees, and for her personal benefit; written and oral promises that Inventis would pay monthly returns of 15% or annual returns of at least 360% and a return of capital at the end of one year when, in reality, after the scheme collapsed, investors did not receive either their returns or the return of capital; and verbal statements that investor funds were guaranteed and safe when, in reality the funds were neither guaranteed nor safe.

129.    In connection with the offer or sale of securities, Le engaged in a course of conduct to deceive investors. Le made and disseminated false and misleading statements about the use of funds, the source of the returns, and the safety of the investments. Le misappropriated investor funds to make Ponzi-like payments and spent them for her personal benefit. Le was a signatory to the bank accounts, signed checks for payments out of three accounts, handled investor funds and took money to the bank together with Luu, and played a role in the Ponzi-like payments, passing the

payments off as returns on investment when, in fact, they were payments of other investors' capital. Le furthered the scheme by lulling investors into feeling their investments were secure after the initial investments were made and after the scheme collapsed, reassuring investors that she would pay their promised returns and referring them to various schemes that would allegedly allow them to recoup the funds they had invested in Inventis.

130.    By engaging in the conduct described above, Defendant Le, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser. In doing so, Defendant Le acted with scienter.

131.    By engaging in the conduct described above, Defendant Le violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), 77q(a)(2), & 77q(a)(3).

## FOURTH CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Sections 17(a)(1) and (3) of the Securities Act

### (against Defendant Luu)

132.    The SEC realleges and incorporates by reference paragraphs 1 through 131 above.

133.    In connection with the offer or sale of securities, Luu engaged in a scheme to defraud investors by controlling the bank accounts of Inventis and writing more than 95% of the checks issued by Inventis, including those for the Ponzi-like

distribution payments which had the effect of falsely confirming Le's assertions that Inventis was a successful business, and by engaging in lulling activities together with Le, including personally and falsely claiming that investors would receive their payments by funding Trage accounts.

134. By engaging in the conduct described above, Defendant Luu, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) employed devices, schemes, or artifices to defraud; and (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser. In doing so, Defendant Luu acted with scienter and his conduct was unreasonable and therefore negligent

135. By engaging in the conduct described above, Defendant Luu violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) & 77q(a)(3).

## FIFTH CLAIM FOR RELIEF

### Unregistered Offer and Sale of Securities

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (against Defendant Le)

136. The SEC realleges and incorporates by reference paragraphs 1 through 135 above.

137. The Inventis contracts were securities that Le and Inventis offered and sold through interstate commerce to investors in multiple states while no registration statement was filed or in effect with the SEC pursuant to the Securities Act with respect to the offer of the securities, and no exemption from registration existed with respect to the securities or offer.

138. Le was a necessary participant and a substantial factor in Inventis's offer and sale of the unregistered security. She was described as the "head boss", she made representations to investors about the investment, she trained employees on what to

say to investors, she signed contracts evidencing the investments, and she controlled the hiring, firing, and compensation of employees.

139.   By engaging in the conduct described above, Defendant Le, directly or indirectly, singly and in concert with others, has made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

140.   By engaging in the conduct described above, Defendant Le has violated, and unless restrained and enjoined, is reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) & 77e(c).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure:

(a)    permanently enjoining Le, and her officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)];

(b)    permanently enjoining Le, and her officers, agents, servants, employees and attorneys, and those persons in active concert or participation with

any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)] or Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(c)    permanently enjoining Luu, and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(3)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

(d)    permanently enjoining Le, and her officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from directly or indirectly, including but not limited to, through any entity owned or controlled by Le, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent her from purchasing or selling securities for her own personal account.

**III.**

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)].

**IV.**

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**V.**

Retain jurisdiction of this action in accordance with the principles of equity and

the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VI.

Grant such other and further relief as this Court may determine to be just and necessary.


Dated: October 15, 2025

/s/ Daniel Blau

Daniel Blau
Tamar Braz
Attorneys for Plaintiff
Securities and Exchange Commission